**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

SHERYL LARUE,

      Plaintiff,

v.                          Civ. No. 20-cv-1142 MV/JFR

THOMAS J. VILSACK, Secretary,
United States Department of Agriculture,

      Defendant.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Thomas J. Vilsack, Secretary, United States Department of Agriculture moves the Court for Summary Judgment on Plaintiff's Counts I (Age Discrimination), Count II (Reverse Race and Color Discrimination) and III (Sex Discrimination), set forth in Plaintiff's Complaint, filed November 4, 2020 (Doc. 1). The only adverse employment action at issue is Plaintiff's termination. *See id.*

Plaintiff, former County Executive Director, Rio Arriba County for the Farm Services Agency, United States Department of Agriculture, brings this action arising from her termination on December 13, 2018. As set forth herein, Plaintiff lacks evidence sufficient to establish the termination was motivated by her age, race, or gender. There being no genuine issues of material fact in dispute, summary judgment should be granted on each Plaintiff's claims.

Counsel for Plaintiff was contacted and opposes this motion. D.N.M.LR-Civ. 7.1(a). Counsel for Plaintiff does not oppose an extension of the page limit for exhibits to 91. D.N.M.LR-Civ. 10.5.

## INTRODUCTION

Plaintiff Sheryl LaRue brings suit for alleged discrimination in the form of termination of her employment as County Executive Director for the Farm Services Agency, in Rio Arriba County, on December 13, 2018 for "Failure to Follow procedure and/or Agency Directives." *See* Decision on Proposed Removal.

As County Executive Director, Ms. LaRue was charged with managing the day-to-day business affairs of the Rio Arriba County Committee, including oversight and administration of the U.S. Department of Agriculture's (USDA) Farm Service Agency's (FSA) Noninsured Crop Disaster Assistance Program (NAP). NAP provides financial assistance to producers (farmers) of non-insurable crops when low yields, loss of inventory or prevented planting occur due to a natural disaster. 7 C.F.R § 1437.1.

To determine the amount of payment to be issued, an approved yield is used to calculate the producer's loss. 7 C.F.R § 1437.102(e)(1). The approved yield is based on average of a minimum four-year period crop year yield. *See id.* The crop year yield used to determine the approved yield may be actual - the total amount of harvested and appraised for a specific acreage, *see* 7 C.F.R § 1437.102(a), or transitional (T-Yield) - based on the county expected yield, used when less than four years of actual yield information is available. 7 C.F.R § 1437.102(b).

Beginning in April 2018, FSA District Director Brandon Terrazas, Ms. LaRue's immediate Agency supervisor, realized that Rio Arriba County Expected Yield numbers for the 2017 growing season did not represent an accurate yield for the county. Mr. Terrazas and the NAP Program Specialist engaged in a series of communications with Plaintiff throughout 2018, in which Plaintiff was informed of the need to work with the Rio Arriba County Committee to

recalculate the County Expected Yield numbers before issuing payments to producers. Despite these directives, Plaintiff failed to ensure proper reconsideration of the expected yield numbers by the Rio Arriba County Committee. As a result of this failure, the Rio Arriba County Committee voted to retain the overstated yield numbers and approved payments to producers using inflated Expected Yield numbers. Though Plaintiff knew or should have known that the Expected Yield numbers were inaccurate, she failed to inform her Agency supervisor, the State Executive Director, or the State Committee of the Committee's decisions, and instead proceeded to issue payments based on calculations that she had been told were incorrect. Plaintiff's conduct resulted in overpayments to agricultural producers in the amount of $301,686.00. The miscalculation of payments was notorious in the community, caused division, and was harmful to the Agency's reputation. Therefore, the State Committee determined that termination was appropriate.

Plaintiff alleges her termination was motivated by discrimination against her, by her younger, white, male supervisor, on the basis of her age, race, and gender. However, Plaintiff's failure to ensure the proper implementation of agency directives was the sole basis for her termination.

Each of Plaintiff's claims fail as a matter of law because Plaintiff has insufficient evidence to establish a prima facie case of reverse race discrimination, age discrimination, or discrimination based on her gender. Even if Plaintiff can establish a prima facie case of discrimination, she cannot demonstrate that Defendant's legitimate business reasons for its employment decisions were pretextual or the result of unlawful discrimination and summary judgment should be granted in favor of Defendant.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Plaintiff is 59 years old. *See* Complaint, ¶ 1 (Doc. 1).

2.      Plaintiff describes herself as a white, Caucasian female. *See id.*

3.      Plaintiff was terminated from her employment as the Rio Arriba County Executive Director (CED) for the Farm Service Agency (FSA) of the United States Department of Agriculture (USDA) on December 13, 2018. *See* Complaint, ¶ 9 (Doc. 1).

4.      As CED, Ms. LaRue was charged with managing the day-to-day business affairs of the Rio Arriba County Committee (COC) and providing guidance to the COC on the implementation of Agency policies. *See* FSA Handbook, 16-AO, Sec. 135A, 179A (Ex. 1).

5.      As CED, Plaintiff was tasked with advising the COC when it proposed action contrary to procedure, and if in doubt, to ask that the matter be referred to the District Director or State Office. *See id.*, Sec. 179A (Ex. 1).

6.      As CED, Plaintiff was supervised by both the COC and the Agency District Director (DD). *See* Organization Chart (Ex. 2); LaRue Declaration, Q.3 (Ex. 3).

7.      Plaintiff's District Director (DD) was Brandon Terrazas, a white male, under the age of 40. *See id.* As DD, Mr. Terrazas served as a liaison between the state office and the county offices, advising them on program and policy issues, and performing some administrative functions for the county executive directors. *See* Terrazas Deposition, ll. 16:7-21 (Ex. 4); *see also* FSA Handbook, 16-AO, Sec. 111A (Ex. 1).

8.      The DD is also responsible for ensuring National and State programs and policies are clearly understood and administered within the assigned district, delivery of FSA programs, and protection of the Government's interests. *See* FSA Handbook, 16-AO, Sec. 111B (Ex. 1).

4

9.      The District Director is supervised by the State Committee (STC) and the State

Executive Director (SED). *See id.,* Sec. 111F (Ex. 1); Organization Chart, (Ex. 2); LaRue

Declaration, Q.3, (Ex. 3).

10.      The SED was Michael White, a white male over the age of 40. *See* White

Declaration, Qs. 5, 15 (Ex.6) (identifying age as 68).

11.      The SED is responsible for directing and administering all FSA programs in the

State, managing all aspects of State Office day-to-day operations, staffing and distribution of

staff, FSA employees within the State, and representing the President [of the United States],

Secretary [of Agriculture], and Administrator in Federal FSA programs. *See* FSA Handbook, 16-

AO, Sec. 96, (Ex.1).

12.      Alisa Ogden, a white female over the age of 40, served as Chair of the STC,

whose members are appointed by the Secretary of Agriculture. *See* Organization Chart (Ex. 2);

Ogden Deposition, 5:15-18, 6:25-7:22 (Ex. 6); LaRue Declaration, Q.31 (Ex. 3).

13.      The STC is required to review and take prompt corrective action if a COC or

County Office Employee fails to carry out a program according to regulations and directives. *See*

Handbook, Sec. 16C (Ex. 1).

14.      As CED, Plaintiff was in charge of providing program guidance to the County

Committee on the review and payment of NAP claims. Terrazas Deposition, 78:10-21 (Ex. 4);

FSA Handbook AO-16, Sec. 179A (Ex.1).

15.      On April 20, 2018, Plaintiff's supervisor, Mr. Terrazas, performed a "first five"

review of five files pending action under the 2017 NAP Program for Rio Arriba County. *See*

Terrazas Deposition, 91:12-92:2 (Ex. 4); *see also* FSA Handbook AO-16, Sec. 111C (DD is

responsible for County Office internal reviews). He determined that the County Expected Yield

(CEY/T-Yield) used to calculate each producer's approved yield did not accurately represent a

reasonable yield for the County, which would result in overpayment to the producers. *See id*.,

92:3-17; *see also* NAP First 5 DD Review Findings (Ex. 7).

16.     Mr. Terrazas had multiple conversations with Plaintiff regarding the need to

correct the CEY/T-Yield prior to payments being calculated and approved. Terrazas Deposition,

111:14-112:5, 130:3-18 (Ex. 4). He informed Plaintiff in person and via email of the expectation

that Plaintiff would advise the County Committee of the issue, and of the applicable policies and

procedures, at the monthly County Meeting Scheduled for May 4, 2018. *See id.;* Email, May 4,

2018 from Terrazas to Larue (Ex. 8).

17.     Although the COC acknowledged the inaccuracies, it made clear that it did not

support changing the 2017 CEY, and instead made a formal motion at the May 4 Meeting to

recommend no action be taken to adjust yields for 2017. *See* COC Meeting Minutes, May 4,

2018 (Ex. 9); Terrazas Deposition, 137:5-139:3 (Ex. 4);

18.     Following the meeting, COC Chairman Charles Hibner reiterated his desire to

leave the County Yield at 4.18 Tons per acre and requested approval to begin issuing payments.

Emails, May 20 and 24, 2018, Hibner/Terrazas (Ex. 10).

19.     In response, Mr. Terrazas explained that while no changes would be made to the

National Crop Table for 2017, existing policy should be followed to make T-Yield adjustments

as necessary for producers. *See id.* Mr. Terrazas made it clear that Plaintiff would advise the

COC on the policy to assist with the adjustments. *See id.*

20.     A program specialist is an expert for whatever programs they are assigned within

the state or state office, and provides program oversight, policy oversight and guidance, and

training to the field (county) offices. *See* Terrazas Deposition, 20:2-20 (Ex. 4); Chavez

Deposition, 12:6-21 (Ex. 11).

21.     FSA Agricultural Program Specialist Anthony Chavez is assigned the NAP in

New Mexico. *See* Chavez Deposition, 15:10-12 (Ex. 11). In that capacity, Mr. Chavez advises

county offices and district directors on the NAP policies established by the national office, as set

forth in the NAP handbook. *See id.,* 15:15-16:22. If he does not understand how the policy is

supposed to be read, he will obtain guidance from the National Office as to how to administer the

policy. *See id.* When it was determined a correction was needed, Mr. Chavez consulted the

national office for guidance as to how to proceed. *See id.,* 43:16-21.

22.     The National Office advised not to make corrections to the 2017 crop year, but

instead to make corrections based on individual producer's own productive capabilities. *See*

Chavez Deposition, 44:8-45:3 (Ex. 11).

23.     Rio Arriba County was not the only county with the issue, as Los Lunas, San

Miguel, and Mora County offices were also required to reassess the county expected yield using

actual production. Terrazas Deposition, 93:11-94:10, ll. 96:4-97:9, 122:14-123:14 (Ex. 4); *see

also* A. Chavez Email, May 29, 2018, (Ex. 12); Chavez Deposition, 45:4-25 (Ex. 11); Ogden

Deposition, 13:12-16:24 (Ex. 5).

24.     On May 29, 2018, Mr. Chavez advised Plaintiff via email that for 2017, the COC

was directed to "look at the policy to reduce the T-Yield on an individual basis per [the

Handbook] Paragraph 407C." *See* A. Chavez Email, May 29, 2018, (Ex. 12).

25.     Paragraph 407C states, the COC will reduce T-Yields for individual units when it

is determined that an unadjusted T-Yield does not accurately reflect the productive capability of

specific crop acreage. *See id.; see also,* T-Yield, para 407 (Ex. 13).

26.     In anticipation of the June 1, 2018 County Meeting, Mr. Terrazas again clarified with Plaintiff and the COC Chairman Plaintiff's role and the expectation that she would guide the Committee through the policies, procedures, and deadlines for the program. *See* Terrazas Emails, June 1, 2018 (Ex. 14). In addition, Mr. Terrazas advised Plaintiff that if she had any questions she could not answer during the meeting, to call him. *See id.*

27.     During the June 1, 2018 County Meeting, the COC reviewed the 2017 NAP producer files and determined not to adjust the yield for any producer. *See* COC Minutes, June 1, 2018 (Ex.15). The COC based its determination on the Chairman's "first-hand knowledge of producer's farm practices" "given the right climate conditions" despite that the County had been in drought up to 24 years. *See id.*

28.     Plaintiff did not notify the DD or anyone at the State Office of the COC's determinations. *See* LaRue Deposition, 182:14-20, 185:1-16 (Ex. 16). Instead, on June 4, 2018, Plaintiff began issuing payments without any adjustment to the T-Yields. *See id.,* 184:15-20.

29.     The State Office did not learn that the payments had issued until July 6, 2018. White Supplemental Declaration, Q. 2 (Ex. 17). When alerted to the payments, SED Michael White sent a memo to Plaintiff instructing her to cease processing all payments immediately. *See* Memo, July 10, 2018 (Ex. 18). Thereafter, the State Executive Director directed that payments already issued would need to be recalculated, adjusted, and if necessary, submitted for repayment. *See* Memo, August 13, 2018 (Ex. 19).

30.     The miscalculation of payments was notorious in the community and was harmful to the Agency's reputation. *See* White Supplemental Declaration, Q. 11(Ex. 17). Given Plaintiff's prominent and public position, the FSA considered Plaintiff's infractions on balance

serious enough to outweigh Ms. LaRue's eighteen-year tenure as an FSA employee and warrant termination. *See id.*

31.     The State Committee consulted with USDA HR Specialist David Simmons, SED Michael White, State Executive Officer Brenda Archuleta, and DD Brandon Terrazas, before issuing its Notice of Proposed Removal. *See* Ogden Deposition, 31:9-23 (Ex. 6); Ogden Declaration, Q.37-40 (Ex. 20).

32.     The State Committee issued Plaintiff a Notice of Proposed Removal on October 11, 2018, citing her failure to follow policy and regulations. *See* Notice of Proposed Removal, October 11, 2018 (Ex. 21).

33.     The State Committee issued a Decision on Notice of Proposed Removal to Plaintiff on December 13, 2018, sustaining all 20 specifications set forth in the Notice of Proposed Removal. *See* Decision on Removal (Ex. 22). The Decision letter was signed by Alisa Ogden, Chairman of the USDA New Mexico FSA State Committee. *See id.*

34.     The Decision on Proposed Removal noted that the CED position is a prominent and public position, and that the failure to follow Agency directives and procedures was very serious and notorious, affecting many producers and diminishing the Agency's reputation. *See id.* Plaintiff's failure to follow directives resulted in overpayments in excess of $300,000.00. *See id.; see also* White Supplemental Declaration, Q.11 (Ex. 17). The STC concluded therefore that removal was appropriate, and a lesser penalty would be inadequate. *See id.*

35.     FSA also terminated the three members of the Rio Arriba County Committee for approving the over payments. Those three members were Charles Hibner (White, Non-Hispanic Male, Age 63), Jake Vigil (White, Hispanic Male, Age 75), and Julian Vigil (White, Hispanic Male, Age 70). *See* Ogden Declaration, Q.41-42 (Ex. 20); Comparative Removals (Ex. 23).

36.    Race, color, sex, or age were not a factor in management issuing Plaintiff the

Decision on Notice of Propose Removal on December 14, 2018. *See* White Declaration, Q. 45-

48 (Ex. 5); Ogden Declaration, Q.45-48 (Ex. 20).

37.    Following a competitive search, Plaintiff's position as Rio Arriba County

Executive Director was filled by Susanah Porchas. *See* Porchas Deposition, 7:13-8:9 (Ex. 24).

Ms. Porchas is a Hispanic female in her thirties. *See id.,* 5:11-14.

## STANDARD Of REVIEW

Summary judgment should occur "if the pleadings, the discovery and disclosure material

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). A movant must "demonstrate the absence of a genuine issue

of material fact..." *Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir.

1991)." The moving party initially carries the burden of pointing out to the trial court that there is

an absence of evidence to support the nonmoving party's case, although the moving party need

not affirmatively negate the non-movant's claim in order to obtain summary judgment." *United*

*States v. Fennell*, 381 F.Supp.2d 1300, 1302 (D.N.M. 2005). "Summary judgment is proper and

appropriate where the movant demonstrates that 'there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law.'" *Mountain Highlands, LLC v.*

*Hendricks*, 2008 WL 6020730 *7 (D.N.M.).

If the moving party meets its initial factual responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). In attempting to

establish the existence of a material factual dispute, the opposing party may not rely upon the

denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a material factual dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586, fn. 11. "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-50.

In this case, Plaintiff cannot establish the essential elements of a claim for age, race, or gender discrimination. Where there is a failure of proof as to essential elements of the complainant's prima facie case, all other facts are rendered immaterial; the Defendant must prevail on these issues as a matter of law, through a grant of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987), cert. denied, 498 U.S. 939 (1990) (upholding grant of summary judgment where no prima facie case is shown).

## LEGAL ARGUMENT

Plaintiff's Complaint alleges discrimination on the basis of her age, race, and gender culminating in her termination. *See* Complaint (Doc. 1), ¶ 1-2. The undisputed material facts establish that she was terminated for failure to follow Agency directives and procedures, and that her termination was unrelated to any protected class.

To evaluate Plaintiff's claims for discrimination, whether under Title VII or the ADEA, the Court should apply the burden shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Beaird v. Seagate Technology, Inc*., 145 F. 3d 1159, 1167 n.4 (10th Cir.), cert. denied, 525 U.S. 1054 (1998) (Title VII and ADEA claims, noting the same analysis applies to discrimination claims based on age,

11

gender, and race); *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (§ 1981); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1079 (10th Cir. 1999) (ADEA claim). Ultimately, "the critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d at 1227 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253(1981)).

Under the *McDonnell Douglas* framework, only after Plaintiff establishes a prima facie case of discrimination is there a presumption created that the employer unlawfully discriminated or retaliated against the employee. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). (1993). This presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case. *Id.* at 506 -507. However, the burden is one merely of production, not persuasion. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000). To meet its burden, a defendant need only articulate a facially nondiscriminatory reason for its conduct. The defendant is not obligated to litigate the merits of its reasoning nor does it need to prove that the reasons relied upon were bona fide. *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1491 (10th Cir. 1995), cert. denied, 516 U.S. 1160 (1996).

Once defendant has met its burden, the presumption of unlawful discrimination drops from the case. *St. Mary's Honor Ctr.*, 509 U.S. at 506. Plaintiff then bears the ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated or retaliated against her. That burden is discharged either directly by proving that the defendant acted with discriminatory motive or indirectly by showing that the stated reason for its action was a pretext for discrimination, i.e., the facially nondiscriminatory reason was a cover-up for a decision

12

motivated by unlawful discrimination. *Flasher*, 986 F.2d at 1316. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and thence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323 (10th Cir. 1997), *citing Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996).

With respect to Plaintiff's claims of discrimination arising out of her termination, Plaintiff cannot establish a *prima facie* case of discrimination based on age, race, or gender. Even if she can establish a prima facie case of discrimination, Defendant articulates legitimate business reasons for its employment decisions, for which Plaintiff cannot demonstrate pretext. As set forth in more detail below, summary judgment on each of Plaintiff's claims should be granted in favor of the Defendant.

## I.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION

### A.  Plaintiff Cannot Meet Her Burden of Proof to Demonstrate Reverse Race Discrimination.

As an initial matter, each of Plaintiff's claims for race discrimination must fail because Plaintiff does not fall into a protected class.

Title VII makes it unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment on the basis of race. *See* 42 U.S.C. § 2000e-2(a)(1). The Tenth Circuit has recognized that "[a]lthough it is clear that Title VII's protection is not limited to those individuals who are members of historically or socially disfavored groups," in the context of "reverse discrimination" case, the *McDonnell Douglas* prima facie case formulation must be modified. *Notari v. Denver Water Dep't.*, 971

F.2d 585, 589 (10th Cir. 1992). Thus, where, as here, it is undisputed that Plaintiff belongs to a historically favored group, the typical prima facie case must be adjusted for the specific context of reverse discrimination. *See Sanchez v. Philip Morris, Inc.*, 992 F.2d 244, 248 (10th Cir. 1993). To support the inference of discrimination despite membership in a historically favored group, Plaintiff must show either a) background circumstances that Defendant is one of those unusual employers who discriminates against the majority, or b) facts sufficient to support a reasonable inference that but for her status the adverse action would not have occurred. *See Notari,* 971 F.2d at 589, 590. This alternative standard is applied in reverse discrimination cases because there is no reason to presume racial discrimination against historically favored groups in the event of adverse employment actions. *See Livingston v. Roadway Express, Inc*., 802 F.2d 1250, 1253 (10th Cir. 1986).

Plaintiff lacks any direct evidence to establish that the Defendant is an unusual employer that discriminates against Whites, in favor of Hispanics. *See Romero v. City and County of Denver Dept. of Social Services*, 57 Fed. Appx. 835, 840 (10th Cir. 2003) (Defendant was not the unusual employer who discriminates against males where two males participated in decision to disqualify male plaintiff from employment); *Babbar v. Ebadi,* 2000 WL 702428 **6 (10th Cir.) (Defendant was not the unusual employer who discriminates against males where another male was given tenure at the same time defendant denied male plaintiff tenure and five of seven tenured members in plaintiff's department were males including the department head). Plaintiff must point to more than conclusory allegations and accusations to support her claim that the Defendant is an unusual employer that discriminates against Whites, in favor of Hispanics. She has adduced no such evidence.

Nor does Plaintiff have any indirect evidence to support "a reasonable inference that but for the plaintiff's status [White] the challenged decision would not have occurred*." Notari v. Denver Water Dept.*, 971 F.2d at 590. In fact, the COC Chairperson, a White male, was also terminated. *See* UMF No. 35.

In sum, Plaintiff's allegations relating to reverse discrimination claim are just that—mere allegations--and they lack sufficient factual and legal support from which a reasonable jury could find in her favor. Because Plaintiff cannot establish that she is a member of a protected class, she cannot establish an essential element of a prima facie case for race discrimination. Therefore, summary judgment should be granted on all of her claims to the extent she asserts race discrimination.

### B. Plaintiff Cannot Meet Her Burden of Proof to Demonstrate a Prima Facie Claim of Age Discrimination.

The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 623 et seq., makes it unlawful for an employer to discriminate against any employee 'because of' that individual's age, § 623(a)(1). The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protective provisions of § 623(a)(1) are limited to individuals who are 40 or older and were prompted by Congress' "concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Maxey v. Rest. Concepts II, LLC*, 654 F.Supp.2d 1284, 1291-2 (D. Colo. 2009) (citing *Greene v. Safeway Stores, Inc*., 98 F.3d 554, 557 (10th Cir. 1996)).

"Under the ADEA, plaintiff must prove that age was a determining factor in defendant's treatment of the complaining employee." *E.E.O.C. v. Sperry Corp.*, 852 F.2d 503, 507 (10th Cir. 1988) (quotation omitted). In other words, even if not the sole reason for the employer's acts, age must have 'made the difference' in the employer's decision. *See id.; see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (plaintiff's age must have "actually played a role in [the employer's decision making] process and had a determinative influence on the outcome.")

The *McDonnell Douglas* burden-shifting framework remains applicable. *See Simmons v. Sykes Enterprises, Inc.*, 647 F.3d 943, 947 (10th Cir. 2011); *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010) Thus, the Court may analyze plaintiff's Title VII and the ADEA claims together under the McDonnell Douglas framework, while keeping in mind that the ADEA does not require employers to evaluate employees perfectly, fairly, or even rationally. *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1153 (10th Cir. 2008). Employers are free to exercise judgment and may terminate at will employees for any reason, so long as it is not unlawful. *Id.* at 1153. Thus, the ordinary meaning of the ADEA's requirement that an employer took adverse action "because of" age is that age was the "reason" that the employer decided to act. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

In order to be within the age group protected by the ADEA, Plaintiff must have been at least 40 years old at the time of the alleged discrimination. *See* 29 U.S.C. § 633a(a). Defendant concedes Plaintiff was in the age group protected by the ADEA. Defendant also concedes Plaintiff was terminated, which constitutes an adverse employment action. *See* 29 U.S.C § 631(a). These facts notwithstanding, Plaintiff cannot establish that age was the but-for reason for

her termination. Other than Plaintiff's bare allegations, she can provide no evidence to indicate that her age was a consideration in the decision to terminate her employment.

### C. Plaintiff Cannot Meet Her Burden of Proof to Demonstrate a Prima Facie Claim of Discrimination Based on Gender.

To establish a prima facie case of wrongful termination because of her gender, Plaintiff must show that she: (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged despite her qualifications; and (4) that the position was not eliminated after Plaintiff's discharge. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir.2005); *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir.2004); *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000). However, the Tenth Circuit has held that "the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios.... Indeed, where an employer contends the actual reason for termination in a discriminatory firing case is not elimination of the employee's position, but, rather, unsatisfactory conduct, the status of the employee's former position after his or her termination is irrelevant." *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir.2005). "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.' " *Id*. (quoting *Kendrick*, 220 F.3d at 1227 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, (1981)).

Here, however, Plaintiff cannot establish the fourth element of a prima facie claim for gender discrimination. She has not identified any admissible evidence that a male employee was treated differently and allowed to retain their position under similar circumstances. And Plaintiff's position was not eliminated, rather her replacement for the position was female.

Finally, while not dispositive, in *Kendrick v. Penske Transp. Services, Inc.* (1999 WL 450886, at *8 (D. Kan. Apr. 13, 1999), *aff'd, Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d

1220 (10th Cir. 2000)), the District Court noted that "...plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class as plaintiff." Here, the Decision on Proposed Removal was signed by State Committee Chairperson Alisa Ogden, herself a White female over the age of 40. UMF No. 12.

## II.   DEFENDANT HAD LEGITIMATE NONDISCRIMINATORY REASONS FOR ITS DECISION TO TERMINATE PLAINTIFF'S EMPLOYMENT

If Plaintiff is able to establish a prima facia case of discrimination, the burden shifts to the employer to demonstrate a facially nondiscriminatory reason for its employment decision. "The defendant's burden to articulate a nondiscriminatory reason has been characterized as an 'exceedingly light' one." *Anaeme v. Diagnostek, Inc*., 164 F.3d 1275, 1279 (10th Cir. 1999) (quoting *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir.1983)). To meet its burden, Defendant is required only to explain its actions in terms that are not facially prohibited by Title VII. *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (quoting *EEOC v. Flasher Co., Inc*., 986 F.2d 1312, 1317 (10th Cir.1992). Defendant does not "need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *EEOC v. Flasher Co., Inc*., 986 F.2d at 1316. Rather, Defendant's "burden at this stage is one of production, not one of persuasion*." EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000). Here, even if Plaintiff can establish a prima facie case of discrimination, on any of the bases that she alleges, the Defendant has articulated legitimate, non-discriminatory reasons for its decision to terminate Plaintiff's employment.

As CED, Ms. LaRue was charged with managing the day-to-day business affairs of the COC and providing guidance to the COC on the implementation of Agency policies, including advising the COC when it proposed action contrary to procedure. UMF Nos. 4, 5, 14. When in

doubt, Plaintiff was clearly directed to ask that the matter be referred to the District Director or State Office. UMF No. 5. Plaintiff was directed both verbally and via email as to how to advise the COC to adjust the T-Yields. *See* UMF Nos. 16, 26. However, Plaintiff not only failed to advise and guide the COC through the review process, she failed to advise the DD or SED or STC of the COC's inaction. *See* UMF Nos. 27, 28. Instead, on June 4, 2018, Plaintiff began issuing payments without any adjustment to the T-Yields, resulting in overpayments. *See* UMF Nos. 28. Upon finding out that Plaintiff and the COC failed to take appropriate action to adjust the T-yields, the STC was required to review and take prompt corrective action. UMF No. 13, 29. The STC described in detail Plaintiff's failure to follow Agency directives and procedures in the Notice of Proposed Removal. *See* UMF Nos. 32.

The State Committee upheld the termination in a Decision on Notice of Proposed Removal issued December 13, 2018, sustaining all 20 specifications set forth in the Notice of Proposed Removal. UMF No. 33.  The STC noted that the infractions were serious and had a negative impact on the Agency's reputation. *See* UMF No 34. Plaintiff's failure to follow directives also resulted in overpayments in excess of $300,000.00. UMF No. 34.

Defendant anticipates that Plaintiff will argue that the basis for the decision to terminate Plaintiff was in error, and that Plaintiff's inaction was due to misunderstanding or inability to act, rather than deliberate disobedience. However, the role of the Court is to prevent unlawful hiring practices, "not to act as a super personnel department that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs*., 165 F.3d 1321, 1329 (10th Cir. 1999), overruled on other grounds by *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)).  "Evidence that the employer should not have made the termination decision--for example, that the employer was mistaken or used poor business

judgment--is not sufficient to show that the employer's explanation is unworthy of credibility."

*DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970-71 (10th Cir. 2017) (internal citation and

quotation marks omitted). Therefore, Defendant plainly meets its burden to establish a legitimate

business reason for Plaintiff's termination.

### III.   PLAINTIFF CANNOT DEMONSTRATE THAT DEFENDANT'S LEGITIMATE REASONS WERE PRETEXTUAL

Summary judgment in favor of a defendant is warranted if plaintiff fails to produce any

evidence from which a reasonable inference could be drawn that the defendant's proffered

reasons were pretextual. *Jones v. Barnhart*, 349 F.3d at 1266 (citing to *Foster v. Allied Signal,*

*Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002). To establish pretext, a plaintiff must show not merely

that the proffered reasons are pretextual but that they are "a pretext for discrimination." *Texas*

*Dept. of Community Affairs v. Burdine*, 450 U.S. at 253 (emphasis added).

> Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (internal punctuation omitted). An

employee typically attempts to show pretext in one of three ways:

> (1) with evidence that the [employer's] stated reason for the adverse employment action was false…; (2) with evidence that the [employer] acted contrary to a written company policy prescribing the action to be taken by the [employer] under the circumstances…; (3) with the evidence that the [employer] acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision.

*Kendrick*, 220 F.3d at 1230 (citations omitted).

Here, Plaintiff has adduced no admissible evidence from which an inference of pretext

can be drawn, and "mere conjecture that [the] employer's explanation is a pretext for intentional

discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co*., 853 F.2d 768, 772 (10th Cir. 1988). The reasons proffered for Plaintiff's termination are clearly set forth in the Decision on Notice of Proposed Removal. *See* UMF No. 33, 34. The pertinent inquiry at this stage does not focus on whether the employer's proffered reasons were wise, fair or correct, but looks at whether the employer honestly believed those reasons and acted in good faith on that belief. *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir.1999), overruled on other grounds by *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Here, the individuals tasked with oversight of the COC and CED – the State Committee and State Executive Director – all concurred with the disciplinary action taken due to the severity of the infractions, and the impact on the Agency. UMF Nos. 30, 31, 34.

Defendant anticipates that Plaintiff will assert that the directions provided her were unclear, or that she did her best to follow them. Defendant disputes this. But, even so, "in determining whether the proffered reason for a decision was pretextual, the Court examines the facts as they appear to the person making the decision, and do not look to the plaintiff's subjective evaluation of the situation." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970-71 (10th Cir. 2017).[1] Even a mistaken belief can be a legitimate, non-pretextual reason for an employment decision. *EEOC v. Flasher Co*., 986 F.2d 1312, 1322 n. 12 (10th Cir.1992).

---

[1] The terminated COC members were also recipients of overpayments based on the incorrect T-Yields. In that capacity, the individual COC members appealed the State Executive Committee's subsequent decision to reduce the T-Yield for all producers in the County. Initially, the USDA National Appeal Division Administrative Judge held that the "finality rule," which would allow a recipient to keep overpayment payment from the USDA when made in error, *see* 7 C.F.R. § 718.306, did not apply since, as members of the County Committee, they had knowledge that the payments were disbursed in error. The individual COC members requested Director Review of the Appeal Determination. The Director overturned the Appeal Decision, holding that the COC did not act in bad faith, and therefore the Finality Rule applied to bar the need for repayment.

In sum, even if Plaintiff can establish a prima facie case of discrimination, she cannot establish that Defendant's stated reasons for terminating Plaintiff were pretextual.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff cannot proffer sufficient, competent summary judgment evidence to support an inference of intentional discrimination based on Plaintiff's, age, race, or gender. For these reasons, Defendant respectfully requests that its motion be granted.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney

*/s/ Erin Langenwalter*
ERIN LANGENWALTER
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274
Fax: (505) 346-7205
erin.langenwalter@usdoj.gov
*Attorneys for Defendant*

---

Defendant expects that Plaintiff will point to this administrative appeal, and that the receivables were not sustained as "proof" of pretext. However, even if the State Committee was wrong to conclude that Plaintiff deliberately failed to follow policy or procedures, there is no evidence to conclude that the termination decision was pretextual, or otherwise motivated by her age, gender, or race. *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (the fact finder must be able to conclude "discrimination was a determinative factor in the employer's actions—simply disbelieving the employer is insufficient").

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 11, 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

> Alexandra W. Jones
> Jones Law Firm, LLC
> 1011 Lomas Blvd. NW
> Albuquerque, NM 87102
> 505-248-1400
> F: (505) 243-6279
> ajones@joneslawabq.com

> */s/ Erin Langenwalter*
> ERIN LANGENWALTER
> Assistant United States Attorney

23