IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHERYL LARUE,

      Plaintiff,

vs.                                                                                                                                                                                                  No. 20-CV-1142

THOMAS J. VILSACK, Secretary,
United States Department of Agriculture,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS MATTER** comes before the Court following Defendant's Motion for Summary Judgment (Doc. 40). The issue presented is whether Plaintiff Sheryl LaRue has established a genuine issue of material fact with respect to her three discrimination claims and, in turn, whether Defendant is entitled to judgment as a matter of law. Having carefully considered the parties' briefing and the applicable law, the Court finds that summary judgment is appropriate for Plaintiff's racial and gender discrimination claims but not for her age discrimination claim. Therefore, Defendant's Motion is **GRANTED IN PART** and **DENIED IN PART.**

**BACKGROUND**[1]

**I.  Introduction**

Sheryl LaRue ("Plaintiff") worked for the Farm Service Agency ("FSA") for nearly 18 years before her abrupt termination in late-2018—a decision she claims was motivated by her age

---

[1] The Court omits references to supporting exhibits for ease of narration. Also, the facts described in this Section are undisputed unless noted otherwise.

(59-years-old), race (Caucasian), and gender (female). At the time, Plaintiff had no documented disciplinary record with the FSA and held the position of Rio Arriba County Executive Director ("CED"). In this capacity, Plaintiff managed the day-to-day business affairs of the Rio Arriba County Committee ("County Committee") and guided them on agency policies. She also assisted with the implementation of the National Crop Assistance Program ("NAP"), which provides a kind of insurance to farmers that helps mitigate the risk posed by natural disasters.

Most of this lawsuit boils down to the alleged actions and statements of Plaintiff's supervisor, Brandon Terrazas, a male under age 40. As District Director, Mr. Terrazas served as the liaison between the state and county offices and ensured the NAP Program's proper administration in various counties including Rio Arriba. In describing the environment Mr. Terrazas fostered at the workplace, Plaintiff stated that he "frequently asked [her] why [she] wasn't retired yet and pushed [her] over and over again to do so. He made comments that older people that have been around forever, need to 'move on' and let younger people fill the positions." At some point, Plaintiff informed her Program Technician Susanah Porchas that the "higher ups" including Mr. Terrazas wanted her to retire—much like two other employees that retired within two years of Mr. Terrazas assuming his position in 2014.

Notably, Plaintiff alleges that at a training event for new Program Technicians Mr. Terrazas stated that it was time to "get some new blood" in the Agency. On this point, Defendant concedes Mr. Terrazas said something to the effect of "[w]e want to train up our new PTs and welcome the new blood and welcome more newcomers," as described by Ms. Porchas. Plaintiff also asserts that despite her numerous requests, Mr. Terrazas never offered her additional opportunities such as attending specialized training events, while consistently encouraging younger employees such as Ms. Porchas to attend those same events. Relatedly, Defendant concedes that Ms. Porchas asked

Mr. Terrazas to stop hitting on her and accompanying her on overnight work trips due to the discomfort he caused her. Such inappropriate behavior stopped thereafter.

According to Plaintiff, the way Mr. Terrazas treated Plaintiff led her to complain to Brenda Archuleta in the Human Resources department on multiple occasions. While most of these complaints were verbal, the record includes one email to Ms. Archuleta in which Plaintiff alleged Mr. Terrazas was harassing her by sternly reminding her of agency policy, namely arriving to work on time. Ms. Archuleta, however, disagreed that this implicated harassment. Furthermore, the year before Plaintiff's termination, Mr. Terrazas began documenting Plaintiff's various alleged deficiencies and encouraged the Rio Arriba County Committee to reprimand and suspend Plaintiff, but the County Committee decided against this action. Therefore, if Mr. Terrazas wanted to discipline Plaintiff, he would have to seek the approval of the State Committee.

## II. The Incident

On April 20, 2018, after reviewing the first five files pending under the 2017 NAP Program for Rio Arriba County, Mr. Terrazas determined that the "county expected yield" used to calculate each producer's individual yield was inaccurate and would result in overpayments.[2] He also found similar issues with Los Lunas, San Miguel, Mora County Offices, for which at least one other CED was ultimately suspended. Upon discovering these purported errors, Mr. Terrazas claims to have informed Plaintiff in person and via email that: (1) the T-Yield needed to be corrected prior to calculating and approving payments and (2) he expected her to advise the County Committee on this issue and applicable policies at the upcoming May 4 meeting. Conversely, Plaintiff alleges that Mr. Terrazas broadly advised her only of the need to guide the County Committee through applicable polices, not to specifically correct the T-Yield.

---

[2] Relying on two later U.S. Department of Agriculture ("USDA") agency decisions—discussed in further detail below—Plaintiff disputes the existence of any such errors.

3

The minutes for the May 4 meeting reflect that the County Committee acknowledged an issue with the T-Yields but did not support amending them. Rather, Chairman Charles Hibner reiterated his desire to leave the County Yield at 4.18 tons per acre and requested approval to begin issuing payments. In response, Mr. Terrazas explained that while no changes would be made to the 2017 National Crop Table, the Committee should follow existing policy to adjust the T-Yield as necessary for individual producers, and that Plaintiff would advise them on policy to assist with such adjustments. After receiving guidance from the national office, Program Specialist Anthony Chavez on May 29, 2018, advised Plaintiff via email that the County Committee should "look at the policy to reduce the T-yield on an individual basis per Paragraph 407C," among other instructions. Relevantly, Paragraph 407C requires the County Committee to reduce T-Yields for individual units when an unadjusted T-Yield does not accurately reflect the productive capability of specific acreage.

In anticipation of the final June 1 meeting, Mr. Terrazas claims to have informed both Plaintiff and the Committee Chairman that Plaintiff should guide the Committee through the applicable policies, procedures, and deadlines. He further advised Plaintiff to call him if she had any questions she could not answer during this important meeting. The minutes indicate that the County Committee reviewed the 2017 NAP producer files and—to Mr. Terrazas' chagrin—decided against adjusting the yields based on the Chairman's "first hand knowledge of producer's farm practices . . . given the right climate conditions." The minutes also include the Committee's glowing review of Plaintiff's work product. Concluding that no adjustment was necessary, the County Committee then directed Plaintiff to issue payments at the original 4.18 yield—a decision later upheld by two USDA agency opinions.

Mr. Terrazas did not follow up with the meeting, nor did Plaintiff notify Mr. Terrazas or anyone at the State Office of the Committee's decision. However, Plaintiff disclaims having any such duty and asserts that her routine circulation of the meeting's minutes communicated this outcome. Upon learning a month later that Plaintiff issued the NAP payments, State Executive Director ("SED") Michael White sent a memorandum[3] to Plaintiff instructing her to immediately stop processing the payments. He also directed payments already issued to be recalculated and, if necessary, submitted for repayment.

**III. The Aftermath**

The FSA State Committee convened to discuss how to discipline Plaintiff and the County Committee for issuing the payments. At the meeting, the Committee consulted with HR Specialist David Simmons, SED Michael White, State Executive Officer Brenda Archuleta, and—most importantly—District Director Brandon Terrazas. Thereafter, the State Committee issued a notice of proposed removal of Plaintiff, outlining twenty reasons why she failed to follow regulations by issuing the overpayments. According to the notice, Plaintiff's position was especially prominent and public, and her failure to follow instruction was notorious in the community. This supposedly diminished the Agency's reputation and resulted in overpayments of over $300,000. Oddly, the State Committee weighed Plaintiff's eighteen-year tenure as a "neutral" factor in evaluating her appropriate discipline. Ultimately, the State Committee decided to fire Plaintiff as well as the three County Committee members: Charles Hibner (63-year-old white male), Jake Vigil (75-year-old white Hispanic male), and Julian Vigil (70-year-old white Hispanic male). Ms. Susanah Porchas was selected among four candidates to fill Plaintiff's position as County Executive Director.

---

[3] While Plaintiff asserts that Mr. Terrazas had a heavy hand in drafting this memo, Mr. White stated during his deposition that: "the program specialist put [it] together with help from the national office" and that "the DD probably looked at it."

To complicate matters further, the County Committee members—receiving NAP payments themselves—appealed through the USDA the FSA's determination to lower the payments. Both agency opinions held that the Committee members acted in good faith and did not err when they disobeyed the State Committee's instruction to adjust the T-Yields. In particular, the USDA Office of the Secretary National Appeals Division opinion held that the State Committee "did not follow its rules when attempting to adjust the [County Committee's] approved yields." Instead, the State Committee's "407C rationale was merely pretext for its decision [to reduce the payments]. FSA discovered a problem, FSA predetermined the outcome, and then FSA engineered a justification for that predetermined outcome." It further held that "[t]here is no evidence to indicate that the calculated payment was . . . based on incorrect information provided by [the County Committee]."

On November 4, 2020, Plaintiff filed the instant lawsuit alleging that Defendant discriminated against her on the basis of age, race, and gender.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could change the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if a reasonable finder of fact could conclude for the nonmoving party. *Id.* Moreover, the record and reasonable inferences are viewed in the light most favorable to the party opposing summary judgement. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgement stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the moving party meets its burden,

"the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of facts could find for the nonmovant." *Id.* (citations omitted).

## ANALYSIS

To determine whether Plaintiff's three claims survive summary judgment, the Court must employ the three-part framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Accordingly, Plaintiff must first establish a prima facie case for each discrimination claim. *Id*. "[T]he critical prima facie inquiry . . . is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quotations and citations omitted). If Plaintiff satisfies this initial burden, Defendant must next "articulate some legitimate nondiscriminatory reason" for the challenged workplace decision. *McDonnell*, 411 U.S. at 802. Lastly, if Defendant carries this burden, Plaintiff must establish that the legitimate reasons the defendant offered were merely pretext for discrimination. *Id.*

**I.   Plaintiff has established a prima facie case only for her age discrimination claim.**

    **a.   Age Discrimination[4]**

Absent direct evidence of discrimination,[5] a prima facie case of age discrimination requires Plaintiff to show that she was: (1) over forty years old; (2) performing satisfactory work; (3)

---

[4] The Court notes that, unlike the instant disparate *treatment* claim, a disparate *impact* claim is not governed by the *McDonnell Douglas* three-part framework and instead entails a much narrower scope of liability. *See Smith v. City of Jackson*, 544 U.S. 228 (2005); *Debroux v. Wormuth*, No. 20-cv-955, 2021 WL 5206903, at *3 n.5 (D.N.M. Nov. 9, 2021) (Johnson, C.J.). For instance, a defendant may foreclose a disparate impact claim by establishing "reasonable factors other than age" underlying the "identifiable employment practice" at issue. *See Pippin v. Burlington Resources Oil & Gas Co.*, 440 F.3d 1186, 1200 (10th Cir. 2006); 29 U.S.C. § 623(f)(1).

[5] If Plaintiff offers *direct* evidence of age discrimination, *McDonnell Douglas* does not necessarily govern the Court's analysis. *See Ramsey v. City & County of Denver*, 907 F.2d 1004, 1007–08 (10th Cir. 1990) (holding that workplace comments that reflect personal bias qualify as direct discrimination evidence if the plaintiff shows the speaker had decision-making authority and acted on his discriminatory beliefs). However, because a finding of liability here

discharged despite the adequacy of this work; and (4) replaced by a younger person. *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir. 1986). The parties do not genuinely dispute these elements, so the Court's analysis turns on whether Plaintiff's age "actually played a role in [Defendant's decision-making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (citations and quotations omitted). In short, the Court finds that Plaintiff has established a prima facie case for age discrimination based on: (1) Mr. Terrazas' alleged statements and (2) his important role in Plaintiff's termination.

First, a reasonable juror could conclude that Mr. Terrazas' alleged statements reflect prejudice toward older employees. Plaintiff claims that Mr. Terrazas "frequently asked [her] why [she] wasn't retired yet and pushed [her] over and over again to do so. He made comments that older people that have been around forever, need to 'move on' and let younger people fill the positions." Moreover, Plaintiff asserts that at a training event for new Program Technicians Mr. Terrazas stated that it was time to get "new blood" in the agency. In response, Defendant concedes that Mr. Terrazas said something to the effect of "[w]e want to train up our new PTs and welcome the new blood and welcome more newcomers," as described by Ms. Porchas. At some point, Plaintiff informed Ms. Porchas that the "higher ups" including Mr. Terrazas wanted her [Plaintiff] to retire—a sentiment supported by two employees retiring within two years of Mr. Terrazas becoming District Director. Lastly, Plaintiff asserts that despite her numerous requests, Mr. Terrazas never offered her additional opportunities like attending specialized training events, while consistently encouraging younger employees such as Ms. Porchas to attend those same events. Together, this alleged evidence warrants the permissible inference that Mr. Terrazas sought to

---

depends on several key inferences described below, the Court finds that Plaintiff has not presented any direct evidence of discrimination. *See Riggs v. AirTran Airways*, 497 F.3d 1108, 1118 (10th Cir. 2007).

replace older employees with younger ones, such as Ms. Porchas who filled Plaintiff's position after her termination.

Second, a reasonable juror could also find that Mr. Terrazas had sufficient influence over the State Committee to have Plaintiff terminated for an unlawful purpose. As District Director, Mr. Terrazas had a more robust understanding of Plaintiff's involvement with the County Committee's decision to not amend the T-Yield. Conversely, the State Committee had minimal to zero contact with Plaintiff and the County Committee before convening to discuss potential disciplinary action. Accounting for this informational asymmetry, one could reasonably find that the Committee relied heavily on Mr. Terrazas' portrayal of the facts in deciding to terminate Plaintiff. Defendant dismisses the possibility that Mr. Terrazas had a determinative impact on the State Committee because he had moved offices by the time the Committee decided to terminate Plaintiff. But by that point, he had already furnished them with all the information they needed to make this decision. Given the turbulent history between Plaintiff and Mr. Terrazas—including his attempt to have her suspended the year prior—a reasonable juror could believe that his presentation was infused with significant bias.[6] This potentially lopsided portrayal of the facts was also exacerbated by Plaintiff never receiving the opportunity to tell her side of the story, though such procedural safeguard was not standard protocol at the FSA.

### b. Racial Discrimination

To establish a prima facie case for racial discrimination, Plaintiff must establish that she (1) was a member of a protected class, (2) suffered an adverse employment decision, (3) was

---

[6] To further support this inference, Plaintiff cites her many HR complaints to Ms. Archuleta about the way in which Mr. Terrazas' treated her. While most of these complaints were verbal, the record includes one email to Ms. Archuleta in which Plaintiff alleged Mr. Terrazas was harassing her by sternly reminding her of agency policy, namely arriving to work on time. The Court agrees with Ms. Archuleta, however, that such a message does not reflect a pattern of harassment.

qualified for her position; and (4) was replaced by someone else. *Notari v. Denver Water Dept.*, 971 F.2d 585, 588 (10th Cir. 1992). The dispute here revolves around the first element, which Plaintiff cannot establish as a Caucasian female. Because this is a so-called "reverse discrimination" case, however, Plaintiff must instead demonstrate either: (1) background circumstances that support an inference that Defendant is "one of those unusual employers who discriminates against the majority"; or (2) sufficient evidence to support specific facts to sustain a reasonable probability that her race proximately caused her to be terminated. *Id.* at 589–90.

Plaintiff argues both prongs, pointing to: (1) statistics suggesting that 65% of FSA employees in the area are Hispanic or Native American, (2) the fact that she was replaced by a Hispanic woman (Ms. Porchas), and (3) the conclusory allegation that she was treated less favorably than minority employees. These statistics, however, offer no insight into whether Defendant's employment practices are discriminatory. *See Jones v. Unisys Corp.*, 54 F.3d 624, 632 (10th Cir. 1995) ("Statistics taken in isolation are generally not probative of . . . discrimination."). Rather, the organization's demographics might simply reflect the fact that many people in the area are, in fact, Hispanic and Native American. Further, the State Committee also fired two Hispanic individuals on the County Committee at the same time, which decreases the probability that Defendant fired plaintiff for being Caucasian. Tellingly, Plaintiff cannot cite a single statement or material action to suggest that the FSA prioritized Hispanics over white people. For these reasons, the Court finds that Plaintiff has not established a prima facie case for racial discrimination.

### c. Gender Discrimination

To establish a prima facie case for gender discrimination, Plaintiff must show that she: (1) belonged to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her

position was not eliminated after her discharge. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). Even assuming Plaintiff satisfies these elements, Mr. Terrazas' alleged behavior falls far short of warranting an inference of gender discrimination. According to the record, he never said or did anything to suggest that he prioritized men over women, or that he held specific prejudice against women. Furthermore, Plaintiff was replaced by a female, and to the extent relevant, her termination was signed by Chairman Ogden—a white female over forty-years-old. *Kendrick v. Penske Transp. Servs., Inc.*, 1999 WL 450886, at *8 (D. Kan. Apr.13, 1999), *aff'd by* 220 F.3d 1220 (10th Cir. 2000) ("[P]laintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class as plaintiff."). Therefore, Plaintiff has not established a prima facie case for gender discrimination.

**II.    Defendant has proffered legitimate reasons for its employment decision.**

Next, Defendant must explain its actions in terms that are not facially prohibited. *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). "The defendant's burden to articulate a nondiscriminatory reason has been characterized as an exceedingly light one." *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (citation and quotations omitted). Moreover, "it is not the duty of a court nor is it within the expertise of the courts to attempt to decide whether the business judgment of the employer was right or wrong. The court is not a super personnel department." *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983). Defendant easily satisfies this standard.

In essence, Defendant asserts that Messrs. Terrazas and Chavez' instructions leading up to the June 1 meeting, as well as Plaintiff's job description, illuminated her duty to advise the County Committee to adjust the T-Yield. Failing to do so and not subsequently informing the State Committee or Mr. Terrazas, according to Defendant, amounted to Plaintiff's failure to follow

Agency directives. As outlined in the twenty specifications for her removal, these infractions were serious, had a negative impact on the Agency's reputation, and allegedly resulted in overpayments in excess of $300,000. The Court agrees that these are facially legitimate nondiscriminatory reasons for Plaintiff's termination. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970–71 (10th Cir. 2017) ("Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility.") (citations and quotations omitted).

### III.     Plaintiff established that the above reasons could be pretext for discrimination.

The burden then shifts back to Plaintiff to present sufficient evidence for a reasonable juror to conclude that the above nondiscriminatory reasons are pretextual. *Simms v. Oklahoma ex rel. Dept. of Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) (citation omitted). Plaintiffs generally demonstrate pretext in three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false . . . (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly situated employees who violated work rules of comparable seriousness.

*Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citations and quotations omitted). In short, "[a]n employee may demonstrate pretext by showing the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (citation omitted). Under this standard, the Court finds that Plaintiff has established pretext for two independent reasons.

First, and most importantly, a reasonable juror could perceive Plaintiff's termination as contrary to the Agency's routine disciplinary procedure. During his deposition, Brandon Terrazas stated that when the Agency decides to discipline an employee, he or she:

> [is] probably going to be on a plan. The name has changed over the years. It used to be a performance improvement plan, and then it was like an opportunity to improve. So they are on a plan at first, and they will know specifically what things need to improve in order to get an acceptable level of performance. And if you don't, you are going to know that you failed that opportunity to improve . . . if you don't see the writing on the wall, you are going to know for sure when they give you a letter of proposed termination.

Yet, Plaintiff never received the opportunity for progressive discipline despite her eighteen-year tenure with no documented disciplinary record. Instead, the State Committee terminated Plaintiff rather abruptly in the wake of a disagreement between the State and County Committees on whether to adjust the T-Yields—a decision only the County Committee could make. Even if Plaintiff's mistake was as egregious as Defendant alleges, the Court nevertheless finds that not offering Plaintiff the chance for progressive discipline was contrary to Agency policy.[7]

Independent from the analysis above, a reasonable juror could also find that Defendant offered a false basis for Plaintiff's termination. Critical to reaching this inference are the two USDA opinions[8] holding that the Committee members acted in good faith and did not err when it disobeyed the State Committee's instruction to adjust the T-Yields. Relevantly, the National Appeals Division opinion held that the State Committee's "407C rationale was merely pretext for its decision [to reduce the payments]. FSA discovered a problem, FSA predetermined the outcome,

---

[7] Plaintiff notes that another CED was suspended at about the same time for a mistake relating to her neighboring county's T-yield. However, Plaintiff failed to reveal to the Court the particulars of that situation to establish whether he or she was treated less favorably than Plaintiff. For instance, the severity of that employee's mistake *could have* been much less egregious than Plaintiff's purported mistake in the facts at bar. Put simply, such a vague and unsubstantiated reference poses more questions than it answers.

[8] These two opinions are not dispositive on the instant lawsuit in any way. And to be fair, they did not comment on Plaintiff's individual involvement in the payment process, nor did they touch on any civil rights questions. They are nevertheless helpful in better understanding the core factual disputes in this matter—namely, the events precipitating the State Committee's termination decisions.

and then FSA engineered a justification for that predetermined outcome." It further held that "[t]here is no evidence to indicate that the calculated payment was . . . based on incorrect information provided by [the County Committee]." These findings place into dispute whether an error with the T-Yields existed in the first place and—if no error existed—whether Mr. Terrazas[9] had a good faith basis for reaching such a conclusion. *See Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1153 (10th Cir. 2008) ("Employers are free to terminate at will employees for any other reason—however unfair, unwise, or even erroneous—so long as it is not unlawful.") (citation omitted). The Court underscores these factual questions not to second-guess the Agency's business determination, but rather to ascertain whether the Agency's proffered reasoning adequately aligns with the events precipitating Plaintiff's termination. Gauging the disparity between these two, a jury could reasonably find that Defendant offered a false basis for Plaintiff's termination.

Relatedly, the parties vigorously dispute whether Plaintiff *should have* known that she was supposed to advise amending the T-yield. On one hand, Defendant asserts that Messrs. Chavez and Terrazas' combined instructions leading up to the June 1 meeting shined a spotlight on this responsibility. On the other, Plaintiff claims to have performed her only duty, which was to "guide the County Committee through the 'applicable policy.'" What Plaintiff fails to acknowledge is that "in determining whether the proffered reason for a decision was pretextual, the Court examines the facts as they appear to the person making the decision, and do not look to the plaintiff's subjective evaluation of the situation." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970–71 (10th Cir. 2017) (citations and quotations omitted). Thus, whether Plaintiff subjectively knew

---

[9] Plaintiff does not allege that the State Committee consciously discriminated against Plaintiff, but rather that Mr. Terrazas used his influence over the State Committee for a discriminatory purpose. Therefore, because he serves as the lynchpin of Plaintiff's age discrimination claim, the Court focuses its attention on whether *Mr. Terrazas* had a good faith basis for concluding whether an error existed with the original T-Yields.

that she was supposed to take such action is irrelevant to the analysis at hand. Instead, the fact finder must remain focused on whether the alleged facts—as perceived by Mr. Terrazas and the State Committee—suggest that they provided a false basis for Plaintiff's termination.

For these two independent reasons, the Court finds that Plaintiff has sufficiently established that Defendant's nondiscriminatory reasons are pretextual.

## CONCLUSION

For the above reasons, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 40) is **GRANTED IN PART. THERFORE,** Plaintiff's racial and gender discrimination claims are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendant's Motion is **DENIED IN PART** and, thus, Plaintiff's age discrimination claim may proceed forward.

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE